1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

TSR LLC,

Plaintiff,                          Case No. C21-1705-SKV

8

v.

9

WIZARDS OF THE COAST LLC,

10

Defendant.                          ORDER RE:  MOTION FOR
                                    PRELIMINARY INJUNCTION

11

WIZARDS OF THE COAST LLC,

12

Counterclaim Plaintiff,

13

v.

14

TSR LLC; JUSTIN LANASA; and DUNGEON
HOBBY SHOP MUSEUM LLC,

15

16

Counterclaim Defendants.

17

18

## INTRODUCTION

19

TSR LLC (TSR) filed this civil lawsuit seeking a declaratory judgment as to Wizards of

20

the Coast LLC's (Wizards) lack of ownership over certain trademarks and copyrights.  Dkt. 1.

21

Wizards denies the alleged lack of ownership and filed counterclaims against TSR, Dungeon

22

Hobby Shop Museum LLC (the Museum), and Justin LaNasa, the organizer of TSR and the

23

Museum.  Dkt. 11.  Wizards' counterclaims include false designation of origin and

1   cybersquatting in violation of Section 43(a) and (d) of the Lanham Act, 15 U.S.C. § 1125(a) and

2   (d), common law trademark infringement and unfair competition, and violations of North

3   Carolina and Washington State law.

4         Wizards now moves for a preliminary injunction.  Dkts. 31 & 35-2.  TSR, the Museum,

5   and Mr. LaNasa (collectively "Counterclaim Defendants") oppose the motion.  Dkt. 37.  The

6   Court, having held oral argument and having considered the pending motion, the filings in

7   support and opposition, and the remainder of the record, DENIES the motion for the reasons set

8   forth below.

9                                         BACKGROUND

10         The motion for preliminary injunctive relief concerns the use of "TSR" and "Star

11   Frontiers" word marks ("TSR Mark" and "Star Frontiers Mark" or, collectively, "Marks").

12   Wizards' association with these trademarks dates back to 1997, when it purchased TSR, Inc., the

13   company that created Dungeons & Dragons (D&D).  Dkt. 1, ¶12.  TSR, Inc. formally assigned

14   all of its U.S. trademark registrations to Wizards on or about May 30, 1997, and the assignment

15   was recorded with the United States Patent and Trademark Office (USPTO) on December 6,

16   2000.  Dkt. 11 at 9, ¶¶17-18, Ex. A.

17         Counterclaim Defendants assert their right to the Marks.  They contend Wizards allowed

18   its rights to be cancelled by failing to submit proof of use in interstate commerce to the USPTO,

19   resulting in cancellation of the registration of the TSR Mark on January 4, 2003 and the Star

20   Frontiers Mark on April 17, 2004.  *See* Dkt. 38, ¶¶5-6, Exs. A-B.  TSR applied for and registered

21   various TSR-related marks beginning on August 19, 2020, began using TSR-related marks in

22   commerce in March and April 2021, and continues to use the Marks today.  Dkt. 39, ¶¶6-11.

23   TSR began to apply for and publicly state an intent to use Star Frontiers-related marks beginning

on October 25, 2020 and, as of August 24, 2022, began offering playing cards bearing the Star Frontiers Mark on the TSR and Museum websites. *Id.*, ¶¶12-14.

Wizards denies the loss of its rights through expiration of the registrations and asserts its common law trademark rights due to its continuous use of the Marks in commerce. Wizards licenses the TSR Mark and related D&D intellectual property to OneBookShelf, Inc., and OneBookShelf, Inc. sells older editions of D&D products bearing the TSR Mark and has sold products bearing the TSR Mark continuously since January 2013. Dkt. 35-1, ¶¶6-7. Wizards also licenses the Star Frontiers Mark to OneBookShelf, which has continuously sold products bearing that mark since November 2017. *Id.*, ¶¶6, 8.

Wizards wrote to TSR claiming Wizards' ownership and continued use of the Marks on June 30, 2021. Dkt. 39, ¶15. In subsequent communications, Wizards demanded Counterclaim Defendants cease and desist their use of the Marks and stated it had licensed the Marks to a third party, but did not provide copies of any license agreements. *Id.*, ¶¶16-17. Wizards also filed a petition in the USPTO to cancel a TSR-related registration that had been issued in August 2021. Dkt. 32, ¶4. On December 29, 2021, TSR filed the current lawsuit in order to resolve the parties' dispute over rights to the Marks. Dkt. 1. In February 2022, Wizards filed USPTO applications for TSR-related marks. Dkt. 38, ¶¶9-12, Exs. E-H.

Counterclaim Defendants assert TSR's superior trademark rights given its USPTO filings and subsequent continuous use and/or public statement of intention to use the Marks in commerce. They dispute Wizards' contention of continuous use. They note, for example, the absence of any evidence Wizards exerted efforts to protect its exclusive use of the Marks between the registration cancellations in 2003/2004 and the sale of products by OneBookShelf beginning in 2013/2017. *See, e.g.,* Dkt. 39, ¶¶4-5.

In seeking preliminary injunctive relief, Wizards states that, in the early days of this litigation, it appeared TSR was not publishing game content with the Marks.  Dkt. 32, ¶6.  While the Museum website offered t-shirts, dice, and stickers with the Marks, it did not have any active listings for game products using the Marks.  *Id*.  However, in July 2022, gaming publications began to cover a "'play test'" release or preview copy of a "Star Frontiers New Genesis" (SFNG) game with racist and transphobic content.  *Id.*, ¶¶10-11, Exs. C-D.  On September 7, 2022, Donald Semora, the owner of Wizard Tower Games and an individual who previously worked with TSR, produced in response to a subpoena a copy of a SFNG play test release containing the offensive material.  *Id*., ¶12, Ex. E (hereinafter "Subpoenaed SFNG").  Based on the negative press and social media reactions to the Subpoenaed SFNG, Wizards' demonstrated commitment to diversity and inclusivity in gaming, *see* Dkt. 35-1, ¶¶11-18, B-E, and the risk that consumers will mistakenly attribute the SFNG game to Wizards, Wizards requested a narrow injunction preventing Counterclaim Defendants' use of the Marks on any iteration of SFNG products.  Dkt. 35-2 at 22-23.

Counterclaim Defendants deny they created, distributed, or authorized distribution of the Subpoenaed SFNG.  They assert that third parties, including Mr. Semora, made unauthorized and offensive alterations to an editable first draft of an SFNG game, Dkt. 39, ¶23, Ex. J, and made those alterations public in the form of the Subpoenaed SFNG.  *See generally* Dkts. 38-40.  As explained by Mr. LaNasa, aside from his co-writer Dave Johnson, the editable draft of the game was distributed only to Mr. Semora, who received a confidential copy protected by a non-disclosure agreement he signed in October 2021 for the purpose of providing editing and related services.  Dkt. 39, ¶¶22, 26.  Mr. Semora thereafter provided Mr. LaNasa with five copies of an edited version of the game, and Mr. LaNasa made five exact photocopies of the edited version.

*Id.*, ¶24,  Ex. K (hereinafter "LaNasa SFNG").  He shared three of the copies with personal friends to receive feedback on the draft.  *Id.*, ¶27.  The personal relationship between Mr. LaNasa and Mr. Semora, and the business relationship between their companies, subsequently fell apart, and they remain embroiled in a dispute over financial and other matters.  *Id.*, ¶37.

Counterclaim Defendants assert that the LaNasa SFNG does not include any racist, transphobic, or other offensive content.  *Id.*, ¶25.  They also oppose the request for preliminary injunctive relief as a general matter, asserting TSR's rights to the Marks and noting they have not sold any SFNG game, that website images reflected only a digital mockup of a future game, and that listings for the game were removed pending resolution of Wizards' motion.  *Id.*, ¶¶48-50, 55.  Counterclaim Defendants went further at oral argument, confirming through counsel that they had no intention of publishing an SFNG game, including any printing, binding, advertising, marketing, and/or selling, until TSR's complaint for a declaratory judgment is decided.  They noted that the LaNasa SFNG version has not yet been beta tested and clarified that the ten copies of that version were distributed only to personal friends, counsel, and parties to this matter.

Wizards, in reply, argues available metadata evidence indicates the Subpoenaed SFNG originated with Counterclaim Defendants.  Dkt. 44, ¶2, Ex. A.  Wizards further argues that, regardless of the version at issue, it has been irreparably harmed by Counterclaim Defendants' activity.  Wizards observes that the Subpoenaed SFNG was distributed publicly only because Counterclaim Defendants were developing SFNG in the first instance, and argues that the LaNasa SFNG also contains offensive content.  At oral argument, Wizards noted Counterclaim Defendants' continued activity in relation to the Marks, including the sale of playing cards which Wizards construed as marketing efforts to promote a potential future release of the SFNG game, as well as ongoing negative attention associated with the SFNG game.

1

DISCUSSION

2      A party seeking a preliminary injunction must satisfy one of two tests. *All. for the Wild*

3  *Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017).  The first test requires the moving party to

4  show:  (1) the likelihood of success on the merits; (2) the likelihood of suffering irreparable harm

5  in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an

6  injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20

7  (2008).  Alternatively, under the "'sliding scale'" version of this test, a preliminary injunction

8  may be appropriate where there are serious questions going to the merits and the balance of

9  hardships tips sharply in a moving party's favor. *All. for the Wild Rockies*, 865 F.3d at 1217

10  (citations omitted).[1]  This alternative test also requires the moving party to satisfy the irreparable

11  harm and public interest factors. *Id*.

12      The purpose of a preliminary injunction is to preserve the positions of the parties until a

13  trial on the merits can be held. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  It is

14  "'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a*

15  *clear showing*, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972

16  (1997) (quoted source omitted; emphasis added by Supreme Court). *See also Winter*, 555 U.S. at

17  24 ("A preliminary injunction is an extraordinary remedy never awarded as of right.").  "'In all

18  cases, the burden of persuasion remains with the party seeking preliminary injunctive relief.'"

19  *Wetzel's Pretzels, LLC v. Johnson*, 797 F. Supp. 2d 1020, 1024 (C.D. Cal. 2011) (quoted source

20  omitted).

21      In this case, Wizards argues it is likely to succeed on the merits of its claim for false

22

23      [1]  "'[S]erious questions' refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo." *Republic of the Phil. v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).

ORDER RE: MOTION FOR
PRELIMINARY INJUNCTION - 6

designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and its claim for common law trademark infringement.  Wizards argues that, given the likelihood of success on the Lanham Act claim, it is entitled to a rebuttable presumption of irreparable harm pursuant to 15 U.S.C. § 1116(a).  Wizards also argues there is a likelihood of irreparable harm even without the presumption and that the balance of equities and public interest favor a grant of injunctive relief.  The Court considers Wizards' arguments and TSR's arguments in opposition below.

A.    Likelihood of Success on the Merits

Wizards argues it is likely to succeed on its Lanham Act clam because it can show Counterclaim Defendants (1) used in commerce (2) a word, false designation of origin, false or misleading description, or representation of fact, which (3) is likely to cause confusion or misrepresents the characteristics of the defendant's or another's goods or services.  *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 902 (9th Cir. 2007) (citing 15 U.S.C. § 1125(a)).  Wizards argues its common law trademark infringement claim provides a second, independent basis for preliminary injunctive relief because it can show both its protectible interest in the Marks and the likelihood of consumer confusion.  *See* RCW 19.77.900; *Bio Mgmt. Nw. Inc. v. Washington Bio Servs.*, No. C20-0670-MJP, 2021 WL 4319448, at *2 (W.D. Wash. Sept. 23, 2021).  Counterclaim Defendants dispute Wizards' ownership of the Marks and its showing as to both use in commerce and the likelihood of confusion.  The Court, as discussed below, concludes that, in light of disputed facts, Wizards fails to make a sufficient showing with respect to the merits.

1.    Ownership of Marks:

The Lanham Act "prohibits false representations about the origin of source or manufacture of goods through the use of another's trade name or trademark, either registered or

unregistered." *SMC Promotions, Inc. v. SMC Promotions*, 355 F. Supp. 2d 1127, 1133 (C.D. Cal. 2005). With unregistered trademarks, a false designation of origin claim is recognized as the equivalent of a claim for trademark infringement. *Id*. Accordingly, for both the false designation of origin claim and the common law trademark infringement claim, Wizards must show it has a protectible ownership interest in a mark and that there is a likelihood of consumer confusion. *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1202-03, 1221 (9th Cir. 2012); *Bio Mgmt. Nw. Inc.*, 2021 WL 4319448, at *2 (citations omitted). *See also Bungie, Inc. v. Aimjunkies.com*, No. C21-0811-TSZ, 2022 WL 1239906, at *3 (W.D. Wash. Apr. 27, 2022) (citing *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985)).

Registration provides prima facie evidence of a valid, protectible interest in a trademark. *Applied Info. Scis. Corp. v. eBay, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007) (citing *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999)). Without registration, a party must establish its common law right to exclusive use of a trademark. *Id*. In this case, Wizards concedes it has not maintained registration of the Marks and asserts its ownership through its common law trademark rights.

"To establish a protectible ownership interest in a common law trademark, the owner must 'establish not only that he or she used the mark before the mark was registered, but also that such use has continued to the present.'" *Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 599 (9th Cir. 2014) (quoting *Watec Co., Ltd. v. Liu*, 403 F.3d 645, 654 (9th Cir. 2005)). "Continuous usage requires sufficiently public usage as 'to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" *Id*. (quoting *Brookfield Commc'ns, Inc.*, 174 F.3d at 1052).

1    Wizards asserts that, while TSR began applying to register the Marks in 2020 and first

2    used the Marks in 2021, Wizards' predecessor in interest (TSR, Inc.) began using the Marks in

3    the 1980s, and Wizards, through its license to OneBookShelf, has continuously used the TSR

4    Mark since at least as early as January 2013 and the Star Frontiers Mark since at least as early as

5    November 2017.  *See* Dkt. 1, ¶¶21-24; Dkt. 32, ¶3, Ex. A; Dkt. 35-1, ¶¶3, 7-8.  Wizards argues

6    its licensing of the Marks and licensee's promotion and sales show the continuous use necessary

7    to maintain a common law trademark.  *See Experience Hendrix, L.L.C. v. Pitsicalis*, No. C17-

8    1927, 2020 WL 3564485, at *3 (S.D.N.Y. July 1, 2020) (finding valid, protectible mark where

9    plaintiffs and their licensees made "continuous and substantial use" of marks), *report and*

10   *recommendation adopted sub nom. Experience Hendrix, LLC v. Hendrix*, 2020 WL 4261818

11   (S.D.N.Y. July 24, 2020).  It argues this use predates and thus precludes TSR's claims to the

12   Marks.

13       Counterclaim Defendants dispute Wizards' alleged ownership interest.  They point, for

14   example, to the absence of evidence showing Wizards' continuous use of the Marks since its

15   1997 acquisition of TSR, Inc. or showing Wizards' protection of its exclusive use of the Marks

16   as would be required to maintain ownership.  Dkt. 39,¶¶ 4-5 (Mr. LaNasa states:  "For example,

17   Jayson Elliot, Ernie Gygax, and Luke Gygax used the TSR Mark . . . between 2011 and 2019

18   without any assertion of superior rights by [Wizards] that I am aware of.")[2]

19       In order to show a likelihood of success on the merits under either the Lanham Act or

20   common law, Wizards must show it has a protectible ownership interest in the Marks.  In

21

22       [2] Counterclaim Defendants also note Wizards' failure to provide the licensing agreement with its
23   motion.  However, Wizards provides a declaration attesting to the licensing of the Marks and to the sale
     of thousands of products bearing the TSR and Star Frontiers Marks for, respectively, nine and five years.
     Dkt. 35-1, ¶¶6-8.  Wizards also notes that it produced the licensing agreement to Counterclaim
     Defendants in discovery and that it would supplement the record upon request.  Dkt. 43 at 10 & n.2.

1   asserting ownership, Wizards maintains it need not offer more than the beginning date and

2   subsequent use of the Marks by its licensee.  In so doing, Wizards did not respond to

3   Counterclaim Defendants' assertions as to the lengthy gap in time between Wizards' acquisition

4   and later licensing of the Marks and its failure to preserve its exclusive use of the Marks.  At oral

5   argument, Counterclaim Defendants argued these and other issues remain in dispute and

6   preclude a finding in Wizards' favor on the question of trademark ownership.

7          "[I]n deciding a motion for a preliminary injunction, the district court 'is not bound to

8   decide doubtful and difficult questions of law or disputed questions of fact.'"  *Int'l Molders' &*

9   *Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986) (citing *Dymo*

10  *Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964)).  The question of ownership

11  is the issue that prompted TSR to file its lawsuit and that issue remains at the center of the

12  dispute between the parties.  Wizards may well, in future, establish its ownership interest in the

13  Marks through earlier and continuous use.  However, there are too many unresolved issues and

14  factual disputes for the Court to find that Wizards has demonstrated a likelihood of success at

15  this stage.  *See Marina Vape, LLC v. Nashick*, No. C16-1028, 2016 WL 9086939, at *11 (C.D.

16  Cal. May 6, 2016) (finding significant issues as to whether it was appropriate to determine a

17  likelihood of prevailing on the merits where "competing evidence presented by the parties

18  reflects their fundamental disagreement on the facts that underlie their respective claims" as to

19  ownership of a trademark); *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, No. C14-

20  4050, 2014 WL 6788310, at *8 (N.D. Cal. Dec. 2, 2014) (finding that, while plaintiff may

21  ultimately be able to demonstrate ownership of a trademark, there were "too many unresolved

22  issues and factual disputes" for the Court to find a demonstration of a likelihood of success).  *See*

23  *generally SoftMan Prods. Co. v. Adobe Sys.*, 171 F. Supp. 2d 1075, 1092 (C.D. Cal. 2001)

1  ("Adobe does not demonstrate a likelihood of success on the merits of this claim because

2  questions of fact predominate as to the central issue.")

3           2.       Use in Commerce and Likelihood of Confusion:

4           Wizards must also show use in commerce and a likelihood of confusion.  However, the

5  Court is not inclined to enter into a detailed analysis of the arguments addressing the remaining

6  elements of the claims given the outstanding factual dispute and other issues discussed below.

7  The Court therefore declines to assess a likelihood of success on the merits in relation to either

8  use in commerce or a likelihood of consumer confusion.

9           3.       Serious Questions on the Merits:

10          The Court likewise declines to determine whether there are serious questions going to the

11  merits and allowing for a grant of preliminary injunctive relief under the sliding scale test.

12  Instead, and as discussed below, the Court finds that relief is not warranted because the Court

13  finds there is not a likelihood of irreparable harm in the absence of a preliminary injunction.

14  B.      Likelihood of Suffering Irreparable Harm

15          Because the Court does not find a likelihood of success on the merits for the false

16  designation claim, Wizards is not entitled to a rebuttable presumption of irreparable harm under

17  15 U.S.C. § 1116(a).  The Court further finds, for the reasons discussed below, that the

18  likelihood of irreparable harm has not been established.

19          In its motion, Wizards proffered as evidence of irreparable harm the fact that both

20  Wizards and its licensee invest heavily in marketing and promoting role playing game (RPG)

21  products, including Star Frontiers.  Dkt. 35-1, ¶9 (also pointing to a new acquisition of its parent

22  company that will expand its RPG offerings and enable online play).  The motion otherwise

23  focuses almost exclusively on the Subpoenaed SFNG.  Wizards asserts that, from the December

ORDER RE: MOTION FOR
PRELIMINARY INJUNCTION - 11

1    29, 2021 filing of this case until the end of July 2022, it believed TSR was not actually selling or

2    distributing any games bearing the Marks.  *Id*., ¶10.  Wizards further asserts that the racist,

3    transphobic, and other offensive content in the Subpoenaed SFNG directly conflicts with

4    Wizards' commitment to diversity and inclusivity in the gaming community, as demonstrated by

5    its public posts and statements on these issues, associated changes made to its games and

6    advertising content, and public recognition of these efforts.  *Id*., ¶¶11-15, Exs. B-D.  Wizards

7    argues that mistaken attribution of the SFNG game to Wizards will sully its reputation and harm

8    its efforts to promote inclusivity in gaming, *id*., ¶19, and that the damage to its goodwill and loss

9    of control over its reputation constitute irreparable harm.

10          Counterclaim Defendants observe that Wizards bases its concerns regarding reputation

11   and goodwill on the Subpoenaed SFNG, a document Counterclaim Defendants did not create or

12   distribute, and that they wholly disavow.  They argue that, if Wizards is entitled to protection in

13   relation to the Subpoenaed SFNG, it must seek an injunction against the individual(s) who wrote

14   and released that document to the public.

15          Wizards, in its reply, argues that metadata associated with the Subpoenaed SFNG can be

16   interpreted to infer Counterclaim Defendants' involvement or at least undermine their

17   declaration testimony. Dkt. 43 at 11-12 (citing Dkt. 44, ¶¶2-4, Exs. A-C; Dkt. 39, ¶¶23, 41; and

18   Dkt. 40, ¶6).  Wizards also argues that, whether or not Counterclaim Defendants were involved

19   with the Subpoenaed SFNG, their activities resulted in the dissemination and infringement of

20   Wizards' Marks and therefore caused the harm alleged.  Wizards additionally argues it would be

21   harmed by offensive elements of the LaNasa SFNG.  *See* Dkt. 43 at 14.

22          A party seeking preliminary injunctive relief must allege more than a mere possibility of

23   harm; they must "demonstrate that irreparable injury is *likely* in the absence of an injunction."

1   *Winter*, 555 U.S. at 22.  Economic injury alone does not support a finding of irreparable harm

2   because such injury can be remedied by a damage award.  *Rent-A-Ctr., Inc. v. Canyon Television*

3   *& Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (citation omitted).  However,

4   "intangible injuries," including damage to goodwill and reputation, can constitute irreparable

5   harm.  *Id.*  Specifically, under Ninth Circuit law, "'[e]vidence of loss of control over business

6   reputation and damage to goodwill [can] constitute irreparable harm,' so long as there is concrete

7   evidence in the record of those things."  *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747,

8   756 (9th Cir. 2018) (quoted source omitted).  For example, in *adidas Am., Inc.*, 890 F.3d at 756-

9   57, the Ninth Circuit upheld a finding of irreparable harm where "extensive and targeted

10  advertising and unsolicited media," along with tight control of supply, demonstrated adidas

11  "built a specific reputation" around a product with intangible benefits, and customer survey

12  results showing consumer confusion demonstrated those intangible benefits would be harmed

13  without injunctive relief "because consumers will be confused about the source of the shoes."

14  *Id.* (quoted source omitted).  *See also 2Die4Kourt v. Hillair Cap. Mgmt., LLC*, 692 F. App'x

15  366, 369 (9th Cir. 2017) (finding evidence that use of trademarks to release an unapproved line

16  of products after termination of an agreement was enough to show a trademark owner "likely

17  will lose some measure of control over their business reputation in the absence of injunctive

18  relief."); *Amazon.com Inc. v. Robojap Techs. LLC*, No. C20-0694-MJP, 2021 WL 5232130, at *4

19  (W.D. Wash. Nov. 10, 2021) (finding misuse of trademarks harmed Amazon's "goodwill by

20  misleading consumers into believing that Amazon's trademarks were associated with a

21  fraudulent and deceptive tech support scheme.")

22          In this case, the primary basis for Wizards' request for preliminary injunctive relief – the

23  Subpoenaed SFNG – is subject to a dispute of fact.  While it is understandable why the content

1    of the document prompted Wizards to seek a preliminary injunction, the evidence before the

2    Court does not allow for a determination of the individual(s) responsible for creating and

3    disseminating the Subpoenaed SFNG.[3]  What *is* clear is that Counterclaim Defendants have

4    disavowed the Subpoenaed SFNG, rendering an injunction directed at Counterclaim Defendants

5    futile.[4]

6        Similarly, the Court does not find irreparable harm established in relation to the LaNasa

7    SFNG.  There is no evidence this version of an SFNG game has been made available publicly or

8    posed harm to Wizards' reputation and goodwill.  Indeed, the only evidence before the Court is

9    to the contrary.  *See* Dkt. 39, ¶¶ 24-28, 35, 42-45, 48-50 (attesting that the SFNG game does not

10   yet exist in book form and has never been sold or made available to the public, and describing

11   the existence of ten total copies of the LaNasa SFNG, three of which were provided to Mr.

12   LaNasa's personal friends to receive feedback on the draft); *accord* Dkt. 40, ¶¶9-10, 13, and the

13   arguments of counsel at oral argument (explaining that the LaNasa SFNG has not yet been beta

14   tested and that the ten copies of the final draft were distributed only to personal friends, counsel,

15   and parties to this matter).

16       Finally, there is now an additional and compelling reason to conclude that preliminary

17   injunctive relief is not warranted.  At oral argument, counsel for Counterclaim Defendants

18

19   _____

     [3] Nor is the Court bound to resolve the factual dispute at this juncture.  *Int'l Molders' & Allied*

20   *Workers' Loc. Union No. 164,* 799 F.2d at 551.  *See also SQP, Inc. v. Sirrom Sales, Inc.*, 130 F. Supp. 2d
     364, 368 (N.D.N.Y. 2001) ("A disputed question of fact such as this need not be resolved on an
     application for a preliminary injunction. Rather, determination of disputed facts should be made at trial.")

21   (internal citations omitted).

22       [4] Because a moving party must show it is likely to suffer irreparable harm in the absence of a
     preliminary injunction, *Winter*, 555 U.S. at 22, the relief sought must necessarily serve to remedy the

23   harm alleged.  *See, e.g.*, *Montana Env't Info. Ctr. v. Bernhardt*, No. C19-0130, 2021 WL 243140, at *4
     (D. Mont. Jan. 25, 2021) (finding that, because a preliminary injunction would not prevent the injuries
     alleged, Plaintiffs had not satisfied their burden to clearly demonstrate the likelihood of irreparable harm
     in the absence of a preliminary injunction with regard to those injuries).

1   assured the Court they had no intention of publishing an SFNG game until TSR's complaint for a

2   declaratory judgment is decided. It is, under these circumstances, unlikely Wizards will suffer

3   irreparable harm from Counterclaim Defendants' activities in relation to SFNG products pending

4   the outcome of these proceedings.

5         Nor is the Court persuaded by Wizards' remaining arguments. As an initial matter, to the

6   extent Wizards asserts a likelihood of irreparable harm flowing from any and all activities

7   relating to the Marks, this contention is not supported. That is, Wizards does not identify

8   concrete evidence of a loss of control over its business reputation and damage to its goodwill

9   separate and apart from the Subpoenaed SFNG and LaNasa SFNG games, which Counterclaim

10  Defendants have either disavowed or committed to refrain from publishing. In fact, it is apparent

11  Wizards did not see a need for a preliminary injunction until Mr. Semora produced the

12  Subpoenaed SFNG. *See* Dkt. 35-2 at 9-10 (describing the "early days of this litigation", prior to

13  the filing of the motion for a preliminary injunction, as including the "out of stock" website

14  listing for a SFNG game) and 22-23 (stating Counterclaim Defendants' "general infringement

15  can be remedied through future injunctive relief and monetary damages which Wizards will

16  prove at trial" and that Wizards sought only a narrow injunction on use of the Marks on any

17  iteration of SFNG products). At oral argument, Wizards expressed concern regarding the SFNG

18  playing cards that are available on Counterclaim Defendants' website, arguing that the cards

19  reflected Counterclaim Defendants' efforts to market a future game release. But the existence of

20  the cards themselves does not rise to the level of irreparable harm required to warrant a

21  preliminary injunction. It is the harmful *content* of the Subpoenaed and LaNasa SFNG games

22  that Wizards identifies as giving rise to reputational harm, not the fact of the use of the Marks.

23

ORDER RE: MOTION FOR
PRELIMINARY INJUNCTION - 15

1        In sum, because Counterclaim Defendants disavowed the Subpoenaed SFNG and have

2 committed not to publish the LaNasa SFNG during the pendency of this litigation, Wizards does

3 not demonstrate the likelihood of irreparable harm in the absence of a preliminary injunction.

4 The Court therefore need not and does not address whether the balance of equities and public

5 interest favor a preliminary injunction.  *See Ctr. for Food Safety*, 636 F.3d at 1174 (where a

6 moving party does not show it is "'likely to suffer irreparable harm in the absence of preliminary

7 relief,'" the court "need not address the . . . remaining elements of the preliminary injunction

8 standard.") (quoting *Winter*, 555 U.S. at 20).

9 CONCLUSION

10        For the reasons set forth above, the Motion for a Preliminary Injunction, Dkts. 31 & 35-2,

11 is DENIED.  The Clerk is directed to send a copy of this Order to the parties.

12        Dated this 14th day of December, 2022.

13

14

15                      S. KATE VAUGHAN

16                      United States Magistrate Judge

17

18

19

20

21

22

23